FILED
U.S. DISTRICT COURT
EASTERN DISTRICT OF LA
2004 AUG -6 PM 12: 53
LORETTA G. WHYTE
CLERK

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF LOUISIANA**

LARRY F. REUSCHE, Derivatively on behalf of Nominal Defendant The Shaw Group, Inc.,

Plaintiff,

v.

TIM BARFIELD, JR.; ROBERT BELK; J.M. BERNHARD, JR.; RICHARD F. GILL; L. LANE GRIGSBY; DAVID W. HOYLE; ALBERT D. MCALISTER; and JOHN W. SINDERS, JR.;

Defendants;

v.

THE SHAW GROUP, INC.;

Nominal Defendant.

CASE NO.

SHAREHOLDER DERIVATIVE COMPLAINT

04-2213

JURY TRIAL DEMANDED

SECT. N MAG. 3

Plaintiff, Larry F. Reusche ("Reusche" or "Plaintiff"), on behalf of Nominal Defendant, The Shaw Group, Inc., ("Shaw" or the "Company"), by his attorney, submits this Derivative Complaint (the "Complaint") against the Defendants named herein.

## NATURE OF THE ACTION

1. This is a shareholder derivative action brought in the right and for the benefit of Nominal Defendant Shaw against Defendants for their breaches of fiduciary duty, abuse of control, insider selling and other violations of law during the period of October 19, 2000 through June 10, 2004, inclusive (the "Relevant Period").

## JURISDICTION AND VENUE

2. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. § 1332 (a)(2). Plaintiff and Defendants are residents and citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs.



Fee $150
Process
X Dktd
CtRmDep
Doc. No.

3. Venue is proper in this District pursuant to 28 U.S.C. § 1391(a). Many of the acts charged herein, including the preparation and dissemination of materially false and misleading information, occurred in substantial part in this District. Additionally, Defendants maintain their chief executive offices and principal place of business within this District.

4. This action is not a collusive one designed to confer jurisdiction on a court which it would not otherwise have.

**PARTIES**

5. Plaintiff Reusche is a resident of the State of Maryland. He is currently, and was a shareholder of Shaw during the time period in which the wrongful conduct alleged herein was occurring through the present. Plaintiff's Verification is attached hereto.

6. Nominal Defendant Shaw is a corporation organized under the laws of Louisiana with its principal executive offices located at 4171 Essen Lane, Baton Rouge, Louisiana. At all relevant times, Shaw described itself as "a leading global provider of comprehensive services to the power, process, and environmental and infrastructure industries."

7. Defendant Tim Barfield, Jr. ("Barfield") is a resident of the State of Louisiana. Barfield has been a member of Shaw's Board of Directors and Shaw's Chief Operating Officer since September 2003.

8. Defendant Robert L. Belk ("Belk") is a resident of the State of Louisiana. Belk was, at all relevant times, Shaw's Chief Financial Officer. During the Relevant Period, Belk sold Shaw stock for proceeds of $1,463,836.

9. Defendant J. M. Bernhard, Jr. ("Bernhard") is a resident of the State of Louisiana. Bernhard was, at all relevant-times, Chairman of the Board and Shaw's Chief Executive Officer. During the Relevant Period, Bernhard sold Shaw stock for proceeds of $58,851,392.

10. Defendant Richard F. Gill ("Gill") is a resident of the State of Louisiana. Gill was Shaw's Vice President and Chief Operating Officer, and President of Stone & Webster, Inc. ("Stone & Webster") until September 2003. During the Relevant Period, Gill sold Shaw stock for proceeds of $2,284,956.

11. Defendant L. Lane Grigsby ("Grigsby") is a resident of the State of Louisiana. Grigsby has been a member of Shaw's Board of Directors since January 1995. During the Relevant Period, Grigsby sold Shaw stock for proceeds of $666,331.20.

12. Defendant David W. Hoyle ("Hoyle") is a resident of the State of North Carolina. Hoyle has been a member of Shaw's Board of Directors since January 1995. During the Relevant Period, Hoyle sold Shaw stock for proceeds of $451,915.00.

13. Defendant Albert D. McAlister ("McAlister") is a resident of the State of South Carolina. McAlister has been a member of Shaw's Board of Directors since April 1990. During the Relevant Period, McAlister sold Shaw stock for proceeds of $480,762.00.

14. Defendant John W. Sinders, Jr. ("Sinders") is a resident of the State of Texas. Sinders has been a member of Shaw's Board of Directors since March 1995.

15. Defendants Barfield, Belk, Bernhard, Gill Grigsby, Hoyle, McAlister and Sinders, together, are referred to herein as the "Defendants."

16. During the Relevant Period, the Individual Defendants, as senior executive officers and directors of Shaw, were privy to confidential and proprietary information

concerning Shaw, its operations, finances, financial condition, and present and future business prospects via access to internal corporate documents, conversations and connections with other corporate officers and employees, attendance at management and board of directors meetings and committees thereof and via reports and other information provided to them in connection therewith. Because of their possession of such information, the Defendants knew or recklessly disregarded the fact that adverse facts specified herein had not been disclosed to, and were being concealed from, the investing public.

17. The Defendants, because of their positions with the Company, controlled and/or possessed the authority to control the contents of its reports, press releases and presentations to securities analysts and through them, to the investing public. The Individual Defendants were provided with copies of the Company's reports and press releases alleged herein to be misleading, prior to or shortly after their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected. Thus, the Individual Defendants had the opportunity to commit the fraudulent acts alleged herein.

18. As senior executive officers and/or directors and controlling persons of a publicly traded company whose common stock and other securities were, and are, registered with the SEC pursuant to the Exchange Act, and whose shares traded on the New York Stock Exchange ("NYSE") and governed by the federal securities laws, the Defendants had a duty to disseminate promptly accurate and truthful information with respect to Shaw's financial condition and performance, growth, operations, financial statements, business, products, markets, management, earnings and present and future business

prospects, to correct any previously issued statements that had become materially misleading or untrue, so that the market price of Shaw's common stock would be based upon truthful and accurate information. The Defendants' misrepresentations and omissions during the Relevant Period violated these specific requirements and obligations.

19. The Defendants are liable as participants in a fraudulent scheme and course of conduct that operated as a fraud or deceit on purchasers of Shaw common stock by disseminating materially false and misleading statements and/or concealing material adverse facts and/or by passively and recklessly permitting same. The scheme deceived the investing public regarding Shaw's business, operations and management and the intrinsic value of Shaw common stock.

20. Defendants carried out a plan, scheme and course of conduct which was intended to and did: (i) deceive the investing public as alleged herein; (ii) artificially inflate and maintain the market price of Shaw securities; and (iii) enable Defendants to sell thousands of shares of Shaw stock at artificially prices for proceeds of hundreds of millions of dollars. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took or recklessly permitted the actions set forth herein.

21. Defendants (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Shaw securities or recklessly permitted same.

22. In addition to the duties of full disclosure Defendants had a duty to promptly disseminate truthful information that would be material to investors in compliance with the integrated disclosure provisions of the SEC as embodied in SEC Regulation S-X (17 C.F.R. Sections 210.01 *et seq.)* and Regulation S-K (17 C.F.R. Sections 229.10 et seq.) and other SEC regulations, including accurate and truthful information with respect to the Company's operations, financial condition and earnings.

23. Defendants employed devices, schemes and artifices to defraud while in possession of material adverse non-public information, and engaged in the acts and practices alleged herein in an effort to assure investors of Shaw's value and performance and continued substantial growth.

24. Defendants were high-level executives and/or directors at the Company during the Relevant Period and were privy to and participated in the creation, development and reporting of the Company's internal budgets, plans, projections and/or reports and they were aware, or should have been aware in the absence of recklessness, that the Company's dissemination of information to the investing public which was materially false and misleading. Defendants actively participated in the wrongful conduct alleged herein and/or failed to implement proper procedures and controls necessary to prevent same in complete abdication of their fiduciary oversight and responsibility to the Company.

25. As the result of Defendants' wrongful conduct, numerous securities class action lawsuits and an SEC inquiry have been initiated against the Company which has unnecessarily exposed the Company to liability and litigation and investigatory costs.

The Defendants' conduct has also severely damaged the Company's reputation in financial markets.

**SUBSTANTIVE ALLEGATIONS**

26. Shaw describes itself as a vertically integrated provider of complete piping systems and comprehensive engineering procurement and construction ("EPC") services to the power generation industry. The Company also works in the process industries, including petrochemical, chemical and refining, and the environmental and infrastructure sector. Between 1990 and 2002, demand for domestic electricity generation increased substantially while capacity remained relatively flat. This imbalance, coupled with deregulation of the power industry and decommissioning of nuclear plants, resulted in a surge in domestic construction of power plants and resulted in the rapid growth of Shaw's business.

27. Between fiscal year 2000 and fiscal year 2002, Shaw's reported annual net income increased more than threefold, from $30 million to $98.4 million. However, unbeknownst to investors, the Company's reported earnings were artificially inflated through the improper manipulation of reserve accounts established in connection with two large acquisitions, and through the premature recognition of earnings in violation of the Company's own purported polices and Generally Accepted Accounting Principles ("GAAP"). Additionally, the Company failed to disclose the extent to which it was vulnerable to the financial problems that decimated companies in the domestic power generation sector when the sector began its downturn in late 2001.

28. Defendants' wrongful conduct resulted in a run-up of the price of Shaw securities, from $39.56 at the commencement of the Relevant Period, to a high of $62.37 on April

25, 2001.[1] The shares continued to trade at artificially inflated levels until August 5, 2003 when the Company announced that a major customer had missed a $32 million milestone payment, at which time the stock fell to $16.00.

29. In May 2002, the Company sold $490 million in convertible zero coupon liquid yield option notes ("LYONS") and used 1.67 million shares of its artificially inflated stock, then valued at approximately $50 million, as currency to acquire The IT Group, Inc. Additionally, company insiders, including the Defendants, sold Shaw common shares for proceeds of $80.1 million, including proceeds of $58.8 million from shares sold by Defendant Bernhard.

**The Use Of Cookie Cutter Reserves To Boost Profit Margins And Earnings**

30. On July 7. 2000, Shaw announced that it was the successful bidder in the auction for the business of Stone &Webster in a proceeding under Chapter 11 of the U.S. Bankruptcy Code with a purchase price of $38 million in cash, and approximately 2.5 million shares of Shaw common stock (valued at approximately $105 million), and assumed liabilities of approximately $450 million. The transaction, in which Shaw acquired most of Stone & Webster's operating assets, closed on July 14, 2000. Stone & Webster was a holding company, operating through various affiliates that provided full-service, value-added engineering, procurement, construction, consultation and environmental services to the power, process, governmental and industrial markets.

31. In its Annual Report for the fiscal year ended August 29, 2000, on Form 10-K filed with the SEC on November 29, 2000, the Company stated that it had acquired from Stone & Webster a large number of contracts with either inherent losses or lower-than-market remaining profit margins due to the effect of the financial difficulties experienced

[1] All stock prices are adjusted to account for a two-for-one stock split on December 18, 2000.

by Stone & Webster on negotiating and executing the contracts. The Company further stated that it had "adjusted" these contracts to their fair value at acquisition date by establishing a reserve of approximately $83.7 million to reduce contract costs incurred in future periods and adjust the gross margins recognized on the contracts. In addition, Shaw recorded accrued losses on assumed contracts of approximately $36.3 million. The total amount was recorded on the balance sheet as a gross margin reserve of $121.8 million. However, the Company did not identify the contracts to which the reserves were to be applied nor the method by which it was to determine the contracts' actual value, as negotiated by Stone & Webster, relative to their then-current fair market value.

32. In its Form 10-K for the fiscal year ended August 29, 2001, Shaw stated that it had increased the gross margin reserve account, as a result of "a more accurate determination of the actual contract status at the acquisition date" through the addition of $38.1 million to reduce contract costs incurred in future periods and $5.4 million in accrued future cash losses, but again failed to disclose the method by which it arrived at its "more accurate determination of the actual contract status at the acquisition date," relative to the then-current market value of the contracts.

33. In May 2002, Shaw acquired substantially all of the operating assets of The IT Group and its subsidiaries. The IT Group was a provider of diversified environmental consulting, engineering, construction, remediation and facilities management services. The IT Group and one of its wholly-owned subsidiaries, Beneco, were subject to separate Chapter 11 bankruptcy reorganization proceedings and the acquisition was completed pursuant to the bankruptcy proceedings. The acquisition of The IT Group

assets was completed on May 3, 2002 and the acquisition of Beneco's assets was completed on June 15, 2002. The purchase price included $53 million in cash, 1,671,336 shares of Shaw common stock valued at approximately $52,463,000, and the assumption of the outstanding balances of $51,789,000 debtor-in-possession financing provided to The IT Group and Beneco by the Company.

34. In connection with The IT Group Acquisition, Shaw added $36.4 million to the gross margin reserve account, purportedly for adjustments to below-market value contracts, but once again, the Company failed to disclose its determination of the actual contract values relative to the contracts' then-current market value.

35. Throughout the Relevant Period, the Company drew on the gross margin reserve account to reduce costs and thereby increase reported profit margins and earnings, but it never identified the contracts to which the reserves were applied, the method of determining the allocation of the reserves, or the timing of the allocations.

36. The contract reserves were not based on a reliable or reasonable analysis of the actual fair market value of the contracts acquired from Stone & Webster and The IT Group, but rather were "cookie cutter" reserves upon which the Company drew as needed to falsely and misleadingly reduce operating expenses and thereby represent earnings growth as being materially greater than it actually was. Shaw was managing its earnings as opposed to reporting its true financial condition and results.

**The Premature Recognition Of Revenue In Violation Of Shaw's Policies And Generally Accepted Accounting Principles**

37. On November 29, 2001, the Company filed its Form 10-K for the year ended August 31, 2001 in which it set forth its purported revenue recognition policy. In this regard, the Form 10-K stated, in pertinent part, as follows:

> For project management, engineering, procurement, and construction services, the Company recognizes revenues under the percentage of completion method measured primarily on contract costs incurred to date, excluding the costs of any purchased but uninstalled materials, compared with total estimated contract costs. Revenues from cost-plus-fee contracts are recognized on the basis of costs incurred during the period plus the fee earned. Profit incentives are included in revenues when their realization is reasonably assured.

38. Defendants knew or recklessly disregarded that this statement was materially false and misleading because the Company routinely reported revenue in excess of the contract costs incurred to date as a percentage of the total estimated contract costs at completion and, in the case of cost-plus-fee contracts, before the fee was earned and its realization reasonably assured.

39. As noted above, Shaw's revenue recognition policy was to record revenues using the percentage-of-completion method of accounting by relating contract costs incurred to date to total estimated contract costs at completion. Under this method, an estimate of total contract costs (which consist of internal costs, including salaries and wages, and external costs, including subcontractor costs) must be reasonably estimated for each contract. At the end of each accounting period, the percentage to which each of the Company's contracts is complete must be computed based on production costs incurred to date as a percentage of total estimated production costs. This percentage must then be multiplied by the contract's total value to calculate the sales revenue to be recognized.

40. Contrary to its publicly stated policy of revenue recognition, and contrary to GAAP, Shaw improperly overstated the Company's apparent revenue and income growth by inflating the costs expended on fixed-price contracts, leading to improperly inflated revenues and earnings.

**Failure To Disclose The Extent To Which The Company Was Dependent On A Handful Of Customers Who Were Vulnerable To A Downturn In Demand For Domestic Power**

41. In fiscal 2001 and 2002, the Company entered into several significant EPC contracts for new domestic gas-fired combined cycle power plants and recognized revenues of approximately $1.5 billion and $250 million, respectively, in connection with these contracts. As set forth above, the Company prematurely recognized revenue on these contracts and, furthermore, failed to disclose the extent to which its customers were susceptible to a downturn in the energy market and the disastrous effect this would have on Shaw's financial condition and prospects.

42. On August 5, 2002, one such customer, LSP-Pike Energy, LLC ("Pike"), notified the Company of its intention to not pay a scheduled $32 million milestone billing on the required due date of August 4, 2002. The Company further disclosed that, if Shaw and Pike could not work out an agreement by which Shaw would purchase the half-finished power plant, "there could be a material adverse effect to Shaw's ability to meet its current earnings expectations for the quarter." At the time of the announcement, Pike owed the Company approximately $120 million in costs to be incurred and fees over the amounts already paid under the contract. On this news, the price of Shaw fell by 26% from a closing price of $21.76 on August 2, 2002 to a low of $16.02 on August 5, 2002, the next trading day.

43. Throughout the remainder of the Relevant Period, the Company blamed its deteriorating performance on the failure of the Pike project and a down turn in the power generation market when, in fact, it was also attributable to depletion of the margin reserve account Defendants had previously drawn from to bolster earnings. The full truth began to emerge on June 10, 2004, when the Company belatedly disclosed that

the SEC had commenced an investigation into the Company's accounting for certain of its acquisitions.

44. On October 19, 2000, Shaw issued a news release over the *Business Wire* entitled "The Shaw Group Announces Increases in Sales and Earnings For Fourth Quarter and Fiscal Year 2000." In the release, the Company reported fourth fiscal quarter net income of $9.6 million, or $0.59 per share, up 77 percent from earnings of $5.75 million, or $0.49 per share, in the 4th fiscal quarter of 1999. For the full fiscal year, the Company reported net income of $29.5 million, or $1.99 per share, compared to earnings of $18.1 million, or $1.52 per share in fiscal year 1999.

45. With respect to the purported strength of the Company's financial results, the release stated as follows:

> J. M. Bernhard, Jr., Shaw's Chairman. President and Chief Executive Officer, stated, "This has been an exceptional year to add to our solid track record of growth. Our management team was at its best, and our employees at every level should be commended for their commitment to our success. The integration of Stone & Webster is progressing as we had hoped, and we expect to begin adding projects from Entergy Shaw into our backlog by the end of the calendar year. As we move into fiscal 2001, we will continue to act strategically and opportunistically, with an inherent focus on bringing additional value to our shareholders."

46. On October 20, 2000, Merrill Lynch, which subsequently underwrote Shaw's private offering of $490 million convertible zero coupon, liquid yield option notes (the LYONS offering), issued a bulletin headlined "Strong Market, Solid Execution," in which it gave an intermediate term opinion of "accumulate" and rated the stock a long term buy. The bulletin stated, in pertinent part:

> Shaw seems to have had a very strong quarter, with good execution and a strong marketplace both contributing to results. For the year, and excluding ordinary items, EPS were $1.95 per versus $1.46 last year and compared to our estimate of $1.85. . . . ***We had assumed that the***

> ***acquired Stone & Webster assets would be neutral to the quarter, but according to management, they contributed $0.02-0.03 to EPS.*** Bottom line, we think results for the quarter, apples-to-apples, were perhaps a nickel better than we'd expected. . . . We've been expecting SW to be $0.20-$0.30 accretive to FY01, but this may be low if SW could contribute at a $0.20 annual run rate in the quarter even before the associated debt is paid down by asset sales.

[Emphasis added.]

47. On November 29, 2000, Shaw filed its annual report with the SEC on Form 10-K. The Form 10-K contained the following statement with respect to contracts acquired from Stone & Webster:

> The Company acquired a large number of contracts with either inherent losses or lower than market remaining margins due to the effect of the financial difficulties experienced by Stone & Webster on negotiating and executing the contracts. These contracts were adjusted to their fair value at acquisition date by establishing a reserve of approximately $83.7 million which will reduce contract costs incurred in future periods and adjust the gross margins recognized on the contracts. In addition, the amount of the accrued losses on assumed contracts was approximately $36.3 million. Since the date of acquisition of Stone & Webster, the Company reflected a $13.5 million net reduction of contract costs as a result of these accrued contract losses and reserves.

48. The statements referenced above in ¶ 44, 45, and 47 were each materially false and misleading when made as they misrepresented and/or omitted the following adverse facts which then existed and disclosure of which was necessary to make the statements not false and/or misleading, including, but not limited to:

a. The $83.7 million reserve that purportedly adjusted contracts acquired from Stone & Webster to fair value and the accrued losses of $36.3 million were not based upon a reliable or reasonable analysis of the actual fair market value of the contracts, but rather were "cookie cutter" reserves

upon which the Company drew as needed to keep reporting earnings in line or in excess of analysts' estimates;

b. There was, therefore, no reasonable basis for the $13.5 million net reduction of contract costs based on these accrued losses and reserves;

c. As a result of this practice, the Company's reported earnings were artificially inflated;

d. The Stone & Webster acquisition was not accretive to fourth quarter earnings; and

e. The Company improperly reported revenue and earnings in violation of its purported revenue recognition policy.

49. On January 11, 2001. Shaw issued a news release over the *Business Wire* in which it announced its financial results for its first 2001 fiscal quarter ended November 30, 2000. With respect to the results, the release stated, in pertinent part, as follows:

> Baton Rouge, Louisiana, January 11, 2001 - ***The Shaw Group Inc. (NYSE: SGR) ("Shaw" or "the Company") today announced a 109% increase in earnings to $12.2 million, or $0.31 per diluted share, for the first quarter ended November 30, 2000.*** This compares to $5.8 million in earnings before a change in accounting principle, or $0.22 per diluted share, for the three months ended November 30, 1999. These results reflect a two for-one common stock split that was effective on December 15, 2000. The Company also announced an increase in sales for the first quarter of fiscal 2001 to $418.8 million, representing a 178% increase over the prior year's first quarter sales of $150.8 million. . . .
>
> J. M. Bernhard, Jr., Shaw's Chairman, President and Chief Executive Officer, stated, "With solid results posted for the first quarter, we have embarked on another exciting year for our employees, customers and shareholders. Recent events in California's power market reinforce the urgent need to bring power online quickly and efficiently. We expect to see heightened activity over the next several months as developers finalize project sites, negotiate contracts and move quickly into the construction phase of the project cycle."

[Emphasis added.]

50. On January 16, 2001, Shaw filed its Form 10-Q for its first 2001 fiscal quarter with the SEC in which it stated as follows:

> The Company acquired a large number of contracts with either inherent losses or lower than market remaining margins primarily due to the effect that the financial difficulties experienced by Stone & Webster had on negotiating and executing the contracts. These contracts were adjusted to their fair value at acquisition date by establishing a liability of approximately $83,700,000 which will adjust the gross margins recognized on the contracts as the work is performed. The amount of the accrued losses on assumed contracts was approximately $36,300,000. These adjustments will result in a net reduction of contract costs incurred in future periods. During the quarter ended November 30, 2000, cost of sales was reduced by $41,114,000 as these reserves were reduced. During the quarter ended November 30, 2000. the Company provided additional contract reserves of approximately $7,800,000 as adjustments to the fair value of the contracts acquired in the acquisition.

51. On January 16, 2001, Jeffries & Company Research, Inc. issued an update on the Shaw Group that focused on the Company's reported earnings growth. The update was headlined, "Raising Price Target to $53" and stated, in pertinent part:

> **Shaw's Earnings Exceed Expectations Again -** Shaw reported 1Q01 EPS of $0.31, better than both our estimate of $0.27 and the First Call consensus of estimate of $0.28. SGR's earnings were better than expected as the Company posted increased revenues and significantly stronger margins due to an increase in high-margin fabrication work and a decrease in low-margin construction work.

52. The statements referenced above in ¶ 49, 50, and 51 were each materially false and misleading when made for the reasons stated in ¶ 48.

53. On April 11, 2001, Shaw issued a news release over the *Business Wire* in which it announced its financial results for its second 2001 fiscal quarter ended February 28, 2001. The release was headlined: "The Shaw Group Announces Solid Results For The

Second Quarter Of Fiscal 2001 Backlog Exceeds $3 Billion." With respect to the results, the release stated, in pertinent part:

> Baton Rouge, Louisiana, April 11, 2001 - ***The Shaw Group Inc. (NYSE: SGR) ("Shaw" or "the Company') today announced a 68% increase in earnings before an extraordinary item to $11.8 million, or $0.28 per diluted share, for the three months ended February 28, 2001.*** This compares to earnings of $7.0 million, or $0.22 per diluted share, for the three months ended February 29, 2000. Sales increased 97% for the second quarter of fiscal 2001 reaching $340.3 million, compared to $173.0 million for the second quarter of fiscal 2000.
>
> "With a backlog exceeding $3 billion and consistent financial results, we are extremely pleased with our current position," stated J. M. Bernhard, Jr., Shaw's Chairman, President and Chief Executive Officer. "In the tremendously robust market that we are experiencing today, we have the utmost confidence in the success of our business model, and the value that it brings to all of our stakeholders."

[Emphasis added.]

54. On April 26, 2001, when the price of Shaw securities was near its high, Shaw issued a news release over the *Business Wire* in which it announced that it had entered into an agreement to issue and sell $377 million of 20-year zero coupon Liquid Yield Option (TM) Notes (the "LYONS"). In the release, the Company claimed it had issued the LYONS even though it had no pressing need for funds. In this regard, the release stated:

> J.M. Bernhard, Jr., Shaw's Chairman, President and Chief Executive Officer, commented on the issuance of the LYONS. "In selecting LYONS, we decided to capitalize on the strong demand in the convertibles market as an opportunistic borrowing and leverage our strong financial position with relatively inexpensive capital at attractive terms while maintaining conservative financial ratios and a negative cost of carry. We believe it is advantageous to raise capital when market conditions are favorable in anticipation of future opportunities, even though we have no pressing need for the funds."

According to the Company's Form 8-K filed with the SEC on May 1, 2001, Merrill Lynch, the initial purchaser of the LYONS, exercised its option to purchase additional LYONS, bringing to $490 million the net proceeds received by Shaw from the sale of the LYONS.

55. After the LYONS offering, between May 1, 2001 and June 20, 2001, the Company's share price dropped from $58 to $37.10. In response to this decline, and to shore up the Company's share price, on June 20, 2001 the Company issued a news release over the *Business Wire* in which it stated that it expected continued earnings growth. In this regard, the release stated:

> The Shaw Group Inc. (NYSE:SGR) ("Shaw") announced today that it knows of no specific reason internal to the Company for the recent decline in stock price over the past several days. ***Additionally, the Company noted continued strength in margins and growing backlog.*** Shaw expects to report third quarter results for 2001 on July 10. For the third quarter as well as the year ended August 31, 2001, the Company remains comfortable with current analysts' estimates for earnings, backlog and margins.

[Emphasis added.]

56. On July 10, 2001, the Company issued a news release over the *Business Wire* entitled "The Shaw Group Announces Record Results for the Third Quarter of Fiscal 2001: Backlog exceeds $3.6 billion." The press release, with respect to earnings, stated as follows:

> ***Baton Rouge, Louisiana, July 10, 2001- The Shaw Group Inc. (NYSE: SGR) ("Shaw" or "the Company") today announced a 142% increase in earnings to $17.9 million, or $0.42 per diluted share, for the three months ended May 31, 2001.*** This compares to earnings of $7.4 million, or $0.23 per diluted share, for the three months ended May 31, 2000. Third quarter fiscal 2001 sales increased 125% reaching $394 million, compared to $175 million for the third quarter of fiscal 2000. . . .
>
> For the nine months ended May 31, 2001, the Company reported an increase in earnings before an extraordinary item to $41.9 million, or $1.00 per diluted share. This compares to earnings before a change in accounting principle of $20.2 million, or $0.67 per diluted share, for the

> nine months ended May 31, 2000. Sales for the nine months ended May 31, 2001 increased 131% to $1.2 billion, compared to $499 million in sales for the nine months ended May 31, 2000.

[Emphasis added.]

57. On July 16, 2001, the Company filed its Form 10-Q with the SEC in which it repeated the financial results set forth above and stated the following with respect to contract reserves:

> The Company acquired a large number of contracts with either inherent losses or lower than market remaining margins primarily because Stone & Webster's financial difficulties had negatively affected the negotiation and execution of the contracts. These contracts were adjusted to their fair value at acquisition date and a liability (gross margin reserve) of approximately $83,700,000 was established. This reserve is utilized to adjust the gross margins recognized on the contracts as the work is performed. The amount of the accrued losses on assumed contracts was estimated to be approximately $36,300,000 and a liability (contract loss reserve) of such amount was established at the time of acquisition. These reserves are reduced as work is performed on the contracts and such reduction in the reserves results in a reduction in cost of sales.
>
> These cost of sales reductions increase gross profit. Since August 31, 2000, the Company has further adjusted its initial estimates of these contract reserves. This includes adjustments made during the third quarter to reduce the reserves established for anticipated cash losses on one project and increase the reserves related to gross margin adjustments for certain projects based on the amount and timing of the future cash contract costs related to these projects. These adjustments, as well as the decreases in the cost of sales for the periods indicated, are as follows (in thousands):

| | March 1, 2001 Balance | Reserve Increase (Decrease) | Cost of Sales (Decrease) | May 31, 2001 Balance |
|---|---|---|---|---|
| Three Months ended May 31, 2001 | | | | |
| Gross margin reserves | $54,007 | $12,631 | $(13,550) | $3,088 |
| Contract loss reserves | 36,134 | (15,166) | (4,146) | 16,822 |
| Total | $90,141 | $(2,535) | $(17,696) | $69,910 |

| | September 1, 2000 Balance | Reserve Increase | Cost of Sales (Decrease) | May 31, 2001 Balance |
|---|---|---|---|---|
| Nine Months ended May 31, 2001 | | | | |
| Gross margin reserves | $75,764 | $38,118 | $(60,794) | $53,088 |
| Contract loss reserves | 30,725 | 11,144 | (25,047) | 16,822 |
| Total | $106,489 | $49,262 | $(85,841) | $69,910 |

58. The statements referenced above in ¶ 53, 54, 55, 56, and 57 were each materially false and misleading when made for the reasons stated in ¶ 48.

59. On September 5, 2001, Shaw issued a news release over the *Business Wire* in which it announced that it expected diluted earnings per share for its fiscal year ending August 31, 2002 to be in the range of $2.15 to $2.25, exceeding the then-current First Call consensus estimate of $1.83 per diluted share, and reaffirmed its "comfort" with analysts' First Call earnings consensus estimate of $0.44 per diluted share for the fourth quarter of fiscal 2001.

60. On October 9, 2001, the Company issued a news release over the *Business Wire* entitled "The Shaw Group Inc. Announces Record Results for Fiscal Year 2001: Backlog Reaches $4.5 billion." With respect to earnings, the release stated, in pertinent part:

> Baton Rouge, Louisiana, October 9, 2001 - The Shaw Group Inc. (NYSE: SGR) ("Shaw" or "the Company") today announced an 89% increase in earnings to $19.3 million, or $0.45 per diluted share, for the three months ended August 31, 2001. This compares to earnings of $10.2 million, or $0.30 per diluted share, before an extraordinary item, for the three months ended August 31, 2000. Fourth quarter fiscal 2001 sales increased 46%, reaching $385.7 million, compared to $263.8 million for the fourth quarter of fiscal 2000.
>
> For the year ended August 31, 2001, the Company reported a 101% increase in earnings to $61.2 million, or $1.46 per diluted share, before an extraordinary item. This compares to earnings of $30.4 million, or $0.99

per diluted share, before an extraordinary item and cumulative accounting change, for the year ended August 31, 2000. Sales for the year ended August 31, 2001 increased 102% to $1.5 billion, compared to $763 million in sales for the year ended August 31, 2000. . . .

This has been an extraordinary year of achievement and growth for our Company," stated J. M. Bernhard, Jr., Shaw's Chairman, President and Chief Executive Officer. "Our employees are to be commended for their success in placing us in a position to win. Beyond our record financial results, we are very pleased with the relationships we have formed with our customers and we are confident that they will provide a means for increasing shareholder value as they continue to develop and unfold over the next year."

61. On November 29, 2001, the Company filed its Form 10-K with the SEC in which it repeated its previously released financial results. With respect to contract reserves, the Form 10-K stated, in pertinent part, as follows:

Additionally, the Company acquired a large number of contracts in the Stone & Webster acquisition with either inherent losses or lower than market rate margins due to the effect of the financial difficulties experienced by Stone & Webster on negotiating and executing contracts prior to the acquisition. These contracts were adjusted to their fair value at acquisition date by establishing a gross margin reserve that reduces costs of sales for contracts as they are completed. Costs of sales was reduced by approximately $70.1 million during fiscal 2001 through the utilization of this reserve, which is a non-cash component of income. Costs of sales was also reduced by approximately $29.2 million due to the utilization of the reserve which represents net cash losses on contracts acquired in the Stone & Webster acquisition. The utilization of these reserves resulted in a corresponding increase in gross profit during fiscal 2001. See Note 3 of Notes to Consolidated Financial Statements. . . .

The Company acquired a large number of contracts with either inherent losses or lower than market rate margins primarily because Stone & Webster's previous financial difficulties had negatively affected the negotiation and execution of the contracts. These contracts were adjusted to their estimated fair value at acquisition date (July 14, 2000) and a liability (gross margin reserve) of $121,815,000 was established, including adjustments of $38,118,000 recorded during the one-year allocation period. The adjustment during the allocation period resulted from a more accurate determination of the actual contract status at acquisition date. The amount of the accrued future cash losses on assumed contracts with inherent losses (contract loss reserve) was estimated to be approximately

$41,700,000 (including adjustments totaling approximately $5,400,000 recorded during the allocation period), and a liability of such amount was established. Both reserves are reduced as work is performed on the contracts and such reduction in the reserves results in a reduction in cost of sales and a corresponding increase in gross profit. Goodwill and deferred tax assets for the Stone & Webster acquisition were adjusted by $43,518,000 due to the revisions to the original reserve estimates identified during the allocation period. These reserves and adjustments during the allocation period, as well as the decreases in the cost of sales for the periods indicated are as follows (in thousands):

| | July 14, 2000 Balance | Reserve Increase | Cost of Sales (Decrease) | August 31, 2000 Balance |
|---|---|---|---|---|
| Year ended August 31, 2000 | | | | |
| Gross margin reserves | $83,697 | $ -- | $(7,933) | $75,764 |
| Contract loss reserves | 36,300 | -- | (5,575) | 30,725 |
| Total | $119,997 | $ -- | $(13,508) | $106,489 |

| | September 1, 2000 Balance | Reserve Increase | Cost of Sales (Decrease) | August 31, 2000 Balance |
|---|---|---|---|---|
| Year ended August 31, 2001 | | | | |
| Gross margin reserves | $75,764 | $38,118 | $(70,081) | $43,801 |
| Contract loss reserves | 30,725 | 5,400 | (29,219) | 6,906 |
| Total | $106,489 | $43,518 | $(99,300) | $50,707 |

62. The statements referenced above in ¶¶ 59, 60, and 61 were each materially false and misleading when made for the reasons set forth in ¶ 48 and for the additional reason that the contract adjustments during the allocation period did not result from "a more accurate determination of the actual contract status at acquisition date," but rather was determined solely by Defendants' strategy for the improper management of reported earnings.

63. Between December 7, 2001 and December 12, 2001, the price of Shaw shares fell from $27.50 to as low as $20. The Company immediately thereafter issued a news release over the *Business Wire* to shore up its share price in which it announced that it had suffered no deterioration in its current business or backlog that would account for the recent decline in the stock price and that the Company remained "comfortable" with current analysts' estimates for earnings, backlog and margins for fiscal years 2002 and 2003.

64. On January 14, 2002, the Company issued a news release over the *Business Wire* entitled "The Shaw Group, Inc. Announces Increases In Sales and Earnings for the First Quarter of Fiscal 2002." With respect to earnings, the release stated, in pertinent part, as follows:

> Baton Rouge, Louisiana, January 14, 2002 - The Shaw Group Inc. (NYSE: SGR) ("Shaw" or the Company") today announced a 56% increase in earnings to $19.0 million, or $0.45 per diluted share, for the first quarter ended November 30, 2001. This compares to $12.2 million in earnings, or $0.31 per diluted share, for the three months ended November 30, 2000. The Company also announced an increase in sales for the first quarter of fiscal 2002 to $453.6 million, representing an 8% increase over the prior year's first quarter sales of $418.8 million. . . .
>
> "The results of the first quarter are impressive given the events which occurred in September and the negativity that has saturated the power generation industry over the past several months," stated J. M. Bernhard, Jr., Shaw's Chairman, President and Chief Executive Officer. ***"We are confident that the need for additional power plants remains and that our customers will continue with their building plans.*** Furthermore, with the Company's diversity in other markets, such as process and environmental and infrastructure, Shaw is positioned to quickly capitalize on new opportunities."

[Emphasis added.]

65. The financial results were repeated in the Company's Form 10-Q, also filed on January 14, 2002, which stated in pertinent part, with respect to margin reserve utilization:

> The Company acquired a large number of contracts with either inherent losses or lower than market rate margins primarily because Stone & Webster's previous financial difficulties had negatively affected the negotiation and execution of the contracts. These contracts were adjusted to their estimated fair value as of acquisition date (July 14, 2000) and a liability (gross margin reserve) of $121,815,000 was established, including adjustments of $38,118,000 recorded during the allocation period. The amount of the accrued future cash losses on assumed contracts with inherent losses (contract loss reserve) was estimated to be approximately $41,700,000 (including approximately $5,400,000 of allocation period adjustments), and a liability of such amount was established. The adjustments to these reserves during the allocation period resulted from a more accurate determination of the actual contract status at acquisition date. Commencing with the initial recording of these reserves in the year ended August 31, 2000, the reserves have been reduced as work is performed on the contracts and such reduction in the reserve balances results in a reduction in cost of sales and a corresponding increase in gross profit. The reserve adjustments as well as the decreases in the cost of sales for the periods indicated, are as follows (in thousands):

| | September 1, 2001 Balance | Cost of Reserve Increase | Sales (Decrease) | November 30, 2001 Balance |
|---|---|---|---|---|
| Three months ended November 30, 2001 | | | | |
| Gross margin reserves | $43,801 | $ -- | $(8,058) | $35,743 |
| Contract loss reserves | 6,906 | -- | (1,203) | 5,703 |
| Total | $50,707 | $ -- | $(9,261) | $41,446 |

| | September 1, 2000 Balance | Cost of Reserve Increase | Sales (Decrease) | November 30, 2000 Balance |
|---|---|---|---|---|
| Three months ended November 30, 2000 | | | | |
| Gross margin reserves | $75,764 | $ -- | $(28,374) | $47,390 |
| Contract loss reserves | 30,725 | 7,813 | (12,977) | 25,561 |
| Total | $106,489 | $7,813 | $(41,351) | $72,951 |

66. On January 16, 2002, the Company issued a news release over the *Business Wire* in which it announced that it had signed a letter of intent to acquire all of the assets and businesses of The IT Group, a provider of diversified, value-added consulting, engineering and construction and remediation and facilities management services, for cash and stock.

67. On April 15, 2002, the Company issued a news release over the *Business Wire* in which it announced its financial results for its fiscal year 2002 second quarter ended February 28, 2002. The release was headlined: "The Shaw Group Inc. Announces Increases In Sales And Earnings For The Second Quarter of Fiscal 2002" and stated, in pertinent part, as follows:

> Baton Rouge, Louisiana, April 15. 2002 - The Shaw Group Inc. (NYSE: SGR) ("Shaw" or "the Company") today announced an 81% increase in earnings to $21.3 million, or $0.51 per diluted share, for the second quarter ended February 28, 2002. This compares to earnings before an extraordinary item of $11.8 million, or $0.28 per diluted share, for the three months ended February 28, 2001. The Company also announced an increase in sales for the second quarter of fiscal 2002 to $566.2 million, representing a 66% increase over the prior year's second quarter sales of $340.3 million. . . .
>
> "Our results for the first six months of fiscal 2002 position us for another record year," stated J. M. Bernhard, Jr., Shaw's Chairman, President and Chief Executive Officer. "Our backlog remains firm, and upon the successful completion of the acquisition of The IT Group, we look forward to a major expansion into the environmental, infrastructure and homeland security sector that will diversify our business and bring even greater certainty to our growth going forward."
>
> For the six months ended February 28, 2002, the Company reported a 68% increase in earnings to $40.3 million, or $0.95 per diluted share. This compares to earnings before an extraordinary item of $24.0 million, or $0.58 per diluted share, for the six months ended February 28, 2001. Sales for the six months ended February 28, 2002 increased 34% to $1.0 billion, compared to $759.0 million in sales for the six months ended February 28, 2001.

68. On April 23, 2002, the Company issued a release over the *Business Wire* in which it announced that it had received bankruptcy court approval to acquire The IT Group and that in conjunction with the acquisition of The IT Group, the Company expected to issue approximately 1.8 to 2.5 million shares of its common stock. To further bolster the price of its stock in anticipation of The IT Group acquisition, the Company revised its guidance for earnings per share for its fiscal year ending August 31, 2002 to increase in the range of $0.05 to $0.08, from its previous guidance of $2.15 to $2.25 per diluted share. The Company revised its earnings per share guidance for fiscal 2003 to increase in the range of $0.25 to $0.33 from its previous guidance of $2.65 to $2.85 per diluted share.

69. On May 3, 2002, the Company issued a release over the *Business Wire* in which it announced that it had completed the acquisition of substantially all of the assets of The IT Group in exchange for approximately $52.5 million in cash, approximately 1.67 million shares of Shaw common stock, and the assumption of certain liabilities.

70. On July 11, 2002, the Company issued a news release over the *Business Wire* entitled "The Shaw Group Announces Solid Results for the Third Quarter of Fiscal 2002," which stated, in pertinent part, as follows:

> Baton Rouge, Louisiana, July 11, 2002 - The Shaw Group Inc. (NYSE: SGR) ("Shaw" or `"the Company") today announced a 49% increase in earnings to $26.7 million, or $0.61 per diluted share, for the three months ended May 31, 2002. This compares to earnings of $17.9 million, or $0.42 per diluted share, for the three months ended May 31, 2001. Third quarter fiscal 2002 sales increased 129% reaching $902.6 million, compared to $394.2 million for the third quarter of fiscal 2001.

> "We are very pleased to report solid financial results on a consistent basis," stated J. M. Bernhard, Jr., Shaw's Chairman, President and Chief Executive Officer. "Our strong balance sheet, project execution skills and ongoing strategy to diversify our portfolio of work have all played a key role in allowing Shaw to maintain its track record of growth. Additionally, the integration of our newly acquired assets in the environmental & infrastructure sector is progressing better than expected. We look for this division to be a major contributor to our success going forward."
>
> For the nine months ended May 31, 2002, the Company reported an increase in earnings to $67.0 million, or $1.56 per diluted share. This compares to earnings of $41.7 million, or $1.00 per diluted share, for the nine months ended May 31, 2001. Sales for the nine months ended May 31, 2002 increased 67% to $1.9 billion, compared to $1.2 billion in sales for the nine months ended May 31, 2001.

71. The statements referenced above in ¶¶ 64 - 70 were each materially false and misleading when made for the reasons set forth in ¶¶ 48 and 62 and for the additional reason that the contract adjustments did not result from "a more accurate determination of the actual contract status at acquisition date," but rather was determined solely by Defendants' strategy for the improper management of reported earnings.

72. On August 5, 2002, the Company issued a news release over the *Business Wire* in which it disclosed that the Company had been in discussions with NRG Energy, Inc. ("NRG") with respect to NRG's ability to make a $32 million milestone payment on the required date of August 4, 2002 on the $340 million LSP-Pike Energy, LLC ("Pike") electric power plant project, and that NRG would not make the next scheduled payment. The release further stated that NRG and the Company had reached an agreement for Shaw to acquire substantially all the assets of NRG in exchange for forgiveness of current sums owed the Company, and the payment of $43 million by Shaw to NRG. However, the agreement was subject to the approval of NRG's parent Company, Xcel Energy, and certain of NRG's lenders. On this news, the price of Shaw's shares

dropped by 26% from a closing price of $21.76 on August 2, 2002 to a low of $16.02 on August 5. 2002, the next trading day.

73. On October 14, 2002, the Company issued a release over *Business Wire* in which it announced a 61% increase in earnings to $98.4 million, or $2.26 per diluted share, compared to earnings of $61.0 million, or $1 .46 per diluted share for the year ended August 31, 2001, and a 106% increase in revenue to $3.2 billion, compared to $1.5 billion in revenue for the year ended August 31, 2001. However, recognizing that its gross margin and contract loss reserves were being depleted, such that the Company would no longer be able to rely on them to bolster earnings, Shaw slashed its 2003 earnings estimate from $2.90 to $3.18 per share to $1.92 to $2.08 per share. In the release, Defendants claimed that Shaw's balance sheet was strong and that the reduced earnings guidance resulted from a "downturn in the power generation market."

> "Our strong balance sheet and project execution skills have allowed us to produce record results for another fiscal year," stated J. M. Bernhard, Jr., Shaw's Chairman, President and Chief Executive Officer. "Shaw's diversified portfolio, including our process and environmental & infrastructure operations, as well as our nuclear and other power services, provides a recurring revenue base and level of stability to our operations going forward." Shaw has completed the repurchase of approximately $100 million of its common stock, authorized by its Board of Directors on September 14, 2001, totaling approximately 5.3 million shares. This includes approximately 3.2 million shares purchased in the first of quarter of fiscal 2003, 1.0 million shares in the fourth quarter of fiscal 2002 and 1.1 million shares purchased in previous quarters.
>
> To reflect the downturn in the domestic power generation market, including the potential loss of future profits in connection with the LSP-Pike Energy LLC ("Pike") project, and the PG&E National Energy Group ("NEG"), a subsidiary of PG&E Corporation (NYSE: PCG), Harquahala and Covert projects, Shaw is revising its earnings guidance for fiscal year 2003 to a range of $1.92 to $2.08 per diluted share, from its previous earnings guidance in the range of $2.72 to $3.00 per diluted share. Accordingly, the Company expects revenue to be in the range of $2.8 to

> $2.9 billion for its fiscal year 2003. Previous revenue guidance for fiscal year 2003 was in the range of $3.3 billion to $3.8 billion.

74. On November 26, 2002, the Company filed its annual report for the fiscal year ended August 31, 2002 signed by Defendants Bernhard and Belk in which it reiterated the results announced in its October 14, 2002 news release.

75. On October 16, 2003, the Company issued a news release over the *Business Wire* in which it announced a substantial downturn in earnings. In the release, the Company reported that, for the year ended August 31, 2003, earnings were $20.9 million, or $0.54 per diluted share, compared to earnings of $98.4 million, or $2.26 per diluted share for the year ended August 31, 2002. Once again, the Company blamed the relatively poor showing on weakness in the power generation market, stating, in this regard, as follows:

> "There is no question that the protracted weakness in the power generation market and the subsequent financial instability of some of our energy clients presented challenges never before faced by our company," stated J.M. Bernhard, Jr., Chairman and Chief Executive Officer of The Shaw Group Inc. "However, I am extremely satisfied with the manner in which our organization has responded to these difficulties. We are pleased to report that with the near completion of the NEG projects and our recent settlement with NRG, we have made great strides in putting these negative issues behind us." Mr. Bernhard continued, "Furthermore, we have kicked off our new fiscal year with several major awards and we are experiencing strong booking and bidding activity, especially for fossil and nuclear power EPC and maintenance work."

76. On October 20, 2003, the Company filed its annual report for the fiscal year ended August 31, 2003 signed by Bernhard and Belk in which it reiterated the results announced in its October 16, 2003 press release.

77. On April 14, 2004, the Company issued a release over the *Business Wire* in which the Company reported net income of $2.2 million, or $0.04 per diluted share, for

the second fiscal quarter ended February 29, 2004 compared to a net loss of $7.9 million, or $(0.21) per diluted share, for the same period ended February 28, 2003. With respect to projected third-quarter earnings, the Company stated as follows:

> Primarily due to delays in the startup of two major EPC projects, the Company also announced that third quarter fiscal 2004 earnings are expected to be at the lower end of the range of its previously issued guidance, approximately $0.18 per diluted share, while fourth quarter earnings are expected to be below prior guidance, at approximately $0.28 per diluted share.

78. The statements referenced above in ¶¶ 72 - 77 were each materially false and misleading when made as they misrepresented and/or omitted the following adverse facts which then existed and disclosure of which was necessary to make the statements not false and/or misleading, including, but not limited to the fact that:

a. The Company's steadily declining earnings was not a result solely of the downturn in the domestic power generation market, including the potential loss of future profits in connection with the LSP-Pike Energy LLC ("Pike") project, if at all, but rather, it was also a result of the depletion of the gross margin reserves that the Company had previously used to bolster earnings;

b. The Company improperly reported revenue and earnings in violation of its purported revenue recognition policy; and

c. As a result of the improper application of reserves the Company income statements were, at all relevant times, inherently unreliable.

**The Truth Emerges**

79. After the market closed on June 10, 2004, Shaw issued a news release over the *Business Wire* in which it announced that, on June 1, 2004, it had been notified by the

SEC that the SEC was conducting an informal inquiry and, with respect to the scope of the investigation, stated as follows:

> The SEC has not advised the Company as to either the reason for the inquiry or its scope. However, the request for information appears to primarily relate to the purchase method of accounting for acquisitions, as presented in Shaw's Form 10-K for the fiscal year ended August 31, 2003.

80. On this news, the Company's shares, which had closed at $12.28 on June 10, 2004, dropped more than 12.4% to close at $10.75 on June 11, 2004, the day the market opened again after the long weekend, on more than four times normal volume.

**Defendants' Financial Statements Were Materially False And Misleading And Violated GAAP**

81. At all relevant times, Defendants represented that Shaw's financial statements when issued were prepared in conformity with GAAP, which are recognized by the accounting profession and the SEC as the uniform rules, conventions and procedures necessary to define accepted accounting practice at a particular time. However, in order to artificially inflate the price of Shaw's stock, Defendants used improper accounting practices in violation of GAAP and SEC reporting requirements to falsely inflate its assets, stockholders' equity and earnings.

82. The materially false and misleading Financial Statements resulted from a series of deliberate senior management decisions designed to conceal the truth regarding Shaw's actual operating results. Specifically, as discussed above, Defendants caused the Company to violate GAAP by improperly manipulating accounting reserves and by fraudulently accelerating revenues on long-term contracts.

83. GAAP are those principles recognized by the accounting profession as the conventions, rules, and procedures necessary to define accepted accounting practices at a particular time. As set forth in Financial Accounting Standards Board ("FASB")

Statements of Concepts ("Concepts Statement") No. 1, one of the fundamental objectives of financial reporting is that it provide accurate and reliable information concerning an entity's financial performance during the period being presented. Concepts Statement No. 1, paragraph 42, states:

> Financial reporting should provide information about an enterprise's financial performance during a period. Investors and creditors often use information about the past to help in assessing the prospects of an enterprise. Thus, although investment and credit decisions reflect investors' and creditors' expectations about future enterprise performance, those expectations are commonly based at least partly on evaluations of past enterprise performance.

84. As set forth in SEC Rule 4-01(a) of SEC Regulation S-X, "[f]inancial statements filed with the [SEC] which are not prepared in accordance with [GAAP] will be presumed to be misleading or inaccurate." 17 C.F.R. § 210.4-01(a)(1). Management is responsible for preparing financial statements that conform with GAAP. As noted by the AICPA professional standards:

> financial statements are management's responsibility . . . . [M]anagement is responsible for adopting sound accounting policies and for establishing and maintaining internal control that will, among other things, record, process, summarize, and report transactions (as well as events and conditions) consistent with management's assertions embodied in the financial statements. The entity's transactions and the related assets, liabilities and equity are within the direct knowledge and control of management . . . . Thus, the fair presentation of financial statements in conformity with Generally Accepted Accounting Principles is an implicit and integral part of management's responsibility.

**The Fraudulent Manipulation of Reserves**

85. Shaw falsely inflated its earnings through the release into income of excess or "general" reserves originally established in connection with the Company's purchase acquisitions. Shaw's use of these reserves violated GAAP and its intentional or reckless use of reserves for this purpose without disclosure was fraudulent.

86. During the Relevant Period, Shaw completed a series of purchase acquisitions, and, in undertaking these transactions, Shaw recognized as liabilities accrued losses on assumed contracts and gross margin reserves. As a regular part of Shaw's accounting for these business combinations, however, the Defendants failed to disclose the determination of the actual contract values relative to the contracts' then current market value.

87. GAAP requires the establishment and accrual of reserves for expenses, losses and liabilities, even though payment of the expense, or realization of the loss, may be contingent upon future events. Pursuant to GAAP:

> An estimated loss from a loss contingency . . . shall be accrued by a charge to income if both of the following conditions are met:
>
> a. Information available prior to the issuance of the financial statements indicates that it is probable that an asset had been impaired or a liability had been incurred at the date of the financial statements . . . [and]
>
> b. The amount of loss can be reasonably estimated [footnotes omitted].

Statement of Financial Accounting Standards No. 5 ("FAS No. 5"), *Accounting for Contingencies, ¶ 8* (Mar. 1975).

88. If the reasonable estimate of a particular loss contingency is a range, an amount shall be accrued for the loss. When some amount within the range appears at the time to be a better estimate than any other amount within the range, that amount shall be accrued. When no amount within the range is a better estimate than any other amount, however, the minimum amount in the range shall be accrued. *See,* FASB Interpretation No. 14, *Reasonable Estimation of the Amount of a Loss* (Sept. 1976). If there is at least a reasonable possibility that an additional loss has been incurred, beyond the

amount accrued, disclosure of the nature of the contingency and an estimate of the possible loss or range of loss shall be made. *See* FAS No. 5 ¶ 10.

89. Pursuant to FAS No. 5, companies may establish reserves for identifiable, probable and estimable risks. GAAP specifically forbids the accrual of "general" reserves. *See* FAS No. 5 ¶ 14. Some enterprises have in the past accrued so-called "reserves for general contingencies." General or unspecified business risks do not meet the conditions for accrual in paragraph 8, and no accrual for loss shall be made.

90. Any reserves that do not meet the accrual requirements of FAS No. 5, when identified, should be immediately released into income. A systematic or timed release of excess reserves into income violates GAAP. In this regard, accounting estimates, including estimates for loss contingencies, may change as new events occur, as more experience is acquired, or as additional information is obtained. A change in an accounting estimate should be accounted for in (a) the period of change if the change affects that period only, or (b) the period of change and future periods if the change affects both. If the effect on income is material, disclosure is recommended for changes in estimates made each period in the ordinary course of accounting. Materiality should be considered in relation to both the effects of each change separately and the combined effect of all changes. *See* APB Opinion No. 20 ("APB 20"), *Accounting Changes* (July 1971).

91. GAAP allow companies undertaking business combinations to account for certain preacquisition contingencies and for liabilities for certain costs associated with a business combination, provided that the contingencies meet certain specified criteria and the costs fall within specific, delineated categories of expenses, are properly

planned for, and are properly documented. FAS No. 5; *Accounting for Preacquisition Contingencies of Purchased Enterprises,* FAS No. 38 (Sept. 1980); and *Business Combinations,* Accounting Principles Bd. Opinion No. 16 (Aug. 1970). In the event that an acquiring entity meets these criteria, GAAP allows the entity to establish appropriate liabilities -- what companies sometimes refer to as "reserves."

92. As discussed above, at Shaw, however, accounting for such liabilities in business combinations went far beyond what GAAP permitted. Acquisitions were viewed in large part as opportunities to ensure the viability of future "earnings." Reserves were established to stockpile future income, and the reserves were subsequently reversed to bring those future earnings to fruition.

**Fraudulent Acceleration Of Revenues On Long-Term Contracts**

93. Defendants, also falsely inflated earnings by fraudulently accelerating revenues on its long-term contracts. GAAP requires that products must be delivered or services rendered before revenue can be recognized. *See* Concepts Statement No. *5 Recognition and Measurement in Financial Statements of Business Enterprises* ("Concepts Statement No. 5"); *see also* Staff Accounting Bulletin No. 101 ("SAB 101"), *Revenue Recognition in Financial Statements, Topic* 13, A.1. Revenues are earned when the reporting entity has substantially accomplished what it must do to be entitled to the benefits represented by the revenues. Revenues are realizable when related assets received or held are readily convertible to known amounts of cash or claims to cash. Concepts Statement No. 5 ¶ 83. If collectibility is not reasonably assured, revenues should be recognized on the basis of cash received. Concepts Statement No. 5 ¶ 84g; *see also,* Accounting Research Bulletin No. 43 ("ARB 43"), Ch. 1A, ¶ 1; Accounting

Principles Board Opinion No. 10 ("APB 10"). If payment is subject to a significant contingency, revenue recognition is improper. FAS No. 5.

94. More specifically, Statement of Position 81-1, *Accounting for Performance of Construction-Type and Certain Production-Type Contracts* ("SOP 81-1") and Accounting Research Bulletin No. 45 ("ARB 45") *Long-Term Construction-Type Contracts,* provide guidance in accounting for long-term construction contracts and for recognizing interim revenues and profits on such contracts that are uncompleted at the end of a period. In this regard, companies estimate the percentage of completion of each contract by the "cost on cost" method, i.e., the percentage of completion is estimated based on a ratio of cost to date divided by the total estimated cost of the contract. SOP 81-1 ¶ 44. This method, which Shaw reported using in its financial statements, uses cost as a proxy for progress. Accordingly, by improperly accelerating costs, Defendants improperly accelerated progress on the contract and thus revenues.

95. Shaw's financial statements filed with the SEC during the Relevant Period stated the following with respect to the Company's revenue recognition policy:

> For project management, engineering, procurement, and construction services, the Company recognizes revenues under the percentage of completion method measured primarily on contract costs incurred to date, excluding the costs of any purchased but uninstalled materials, compared with total estimated contract costs. Revenues from cost-plus-fee contracts are recognized on the basis of costs incurred during the period plus the fee earned. Profit incentives are included in revenues when their realization is reasonably assured.

96. On the basis of the manipulation of revenue recognition alone, the financial statements of Shaw during the Relevant Period were materially false and misleading as Defendants materially overstated the Company's revenues in violation of GAAP and its own publicly disclosed revenue recognition policies that materially inflated the operating

results of the Company, and misrepresented that the Company's revenue and earnings were continuing to grow.

**Additional GAAP Violations**

97. As a result of the foregoing, the Defendants caused Shaw's reported financial results to violate, among other things, the following provisions of GAAP for which each Defendant is necessarily responsible:

a. The principle that interim financial reporting should be based upon the same accounting principles and practices used to prepare annual financial statements (APB No. *28, Interim Financial Reporting* ¶ 10 (May 1973));

b. The principle that financial reporting should provide information that is useful to present and potential investors and creditors and other users in making rational investment, credit and similar decisions (FASB Concepts Statement No. 1, 1134);

c. The principle that financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and effects of transactions, events and circumstances that change resources and claims to those resources (FASB Concepts Statement No. 1, ¶ 40);

d. The principle that financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to owners (stockholders) for the use of enterprise resources entrusted to it. To the extent that management offers securities of the enterprise to the public, it voluntarily accepts wider responsibilities for accountability to prospective investors and to the public in general (FASB

Concepts Statement No. 1, ¶ 50);

e. The principle that financial reporting should be reliable in that it represents what it purports to represent. That information should be reliable as well as relevant is a notion that is central to accounting (FASB Concepts Statement No. 2, *Qualitative Characteristics of Accounting Information* ¶¶ 58-59 (May 1980));

f. The principle of completeness, which means that nothing is left out of the information that may be necessary to insure that it validly represents underlying events and conditions (FASB Concepts Statement No. 2, ¶ 79); and

g. The principle that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered. The best way to avoid injury to investors is to try to ensure that what is reported represents what it purports to represent (FASB Concepts Statement No. 2, ¶¶ 95, 97).

**Defendants' Issuance Of Stock As Transaction Currency And Insider Stock Sales**

98. While Shaw's officers and directors were issuing false and misleading statements about Shaw's business, Shaw raised $490 million through the sale of LYONS at artificially inflated prices and used 1.75 million shares of artificially inflated Shaw common stock as currency to pay, in part, for The IT Group. Such transactions using Shaw stock as currency constitute insider trading on a massive scale.

99. The artificial inflation of Shaw's stock price, which resulted from Defendants' materially false and misleading accounting manipulations also enabled certain Shaw insiders to sell shares of Shaw stock which they owned for total proceeds of

$80,137,607 while in possession of material nonpublic information, and to profit from the artificial inflation of Shaw's stock price Defendants' fraud created.

100. As a result of their positions with the Company insiders identified below, including certain of the Individual Defendants, sold the following amounts of Shaw stock at artificially inflated prices during the Relevant Period while in possession of material non-public information:

**Robert Belk: Chief Financial Officer**

| Date of Sale | # of Shares | Price($)/Share | Sale Proceeds($) |
|---|---|---|---|
| January 16, 2001 | 35,000 | 41.82 | **1,463,836.50** |
| **Total** | | | **1,463,836.50** |

**James Bernhard: Chairman and Chief Executive Officer**

| Date of Sale | # of Shares | Price($)/Share | Sale Proceeds($) |
|---|---|---|---|
| July 27, 2001 | 30,000 | 35.02 | 1,050,600.00 |
| July 26, 2001 | 75,000 | 33.25 | 2,493,750.00 |
| July 25, 2001 | 75,000 | 33.75 | 2,531,250.00 |
| July 25, 2001 | 75,000 | 33.75 | 2,531,250.00 |
| July 24, 2001 | 75,000 | 29.65 | 2,223,750.00 |
| July 24, 2001 | 75,000 | 29 65 | 2,223,750.00 |
| January 18, 2002 | 570,000 | 42.26 | 24,087,459.00 |
| January 17, 2002 | 304,800 | 42.47 | 12,945,770.40 |
| January 16, 2002 | 125,200 | 41.69 | 5,219,462.80 |
| **Total** | | | **58,851,392.20** |

**Richard Gill: Executive Vice President**

| Date of Sale | # of Shares | Price($)/Share | Sale Proceeds($) |
|---|---|---|---|
| April 16, 2002 | 20,000 | 30.25 | 604,956 00 |
| January 17, 2001 | 40,000 | 42 00 | 1,680,000.00 |
| **Total** | | | **2,284,956.00** |

**L. Lane Grigsby: Board Member**

| Date of Sale | # of Shares | Price($)/Share | Sale Proceeds($) |
|---|---|---|---|
| January 16, 2001 | 16,000 | 41.65 | **666,331.20** |
| **Total** | | | **666,331.20** |

**David Hoyle: Board Member**

| Date of Sale | # of Shares | Price($)/Share | Sale Proceeds($) |
|---|---|---|---|
| April 25, 2001 | 1,000 | 61 45 | 61,450.00 |
| April 25, 2001 | 900 | 61.45 | 55,305.00 |
| April 25, 2001 | 100 | 61.60 | 6,160.00 |
| January 16, 2001 | 8,000 | 41.13 | 329,000.00 |
| **Total** | | | **451,915.00** |

**Albert McAlister: Board Member**

| Date of Sale | # of Shares | Price($)/Share | Sale Proceeds($) |
|---|---|---|---|
| April 25, 2001 | 1,000 | 63.00 | 63,000.00 |
| April 12, 2001 | 1,800 | 56.78 | 102,204.00 |
| April 12, 2001 | 1,200.00 | 56.84 | 68,208 00 |
| November 17, 2000 | 2,800.00 | 82.50 | 231,000.00 |
| November 17, 2000 | 200 | 81.75 | 16,350.00 |
| **Total** | | | **480,762.00** |

## DEMAND EXCUSED ALLEGATIONS

101. Shaw's Board of Directors is currently composed of eight (8) directors – J.M. Bernhard, Jr., Tim Barfield, James F. Barker, L. Lane Grigsby, David W. Hoyle, Albert D. McAlister, Charles E. Roemer, III, and John W. Sinders, Jr. Each of these Directors except for Barker and Roemer have been named as Defendants herein.

102. Bernhard was Shaw's founder and has served as Shaw's Chief Executive Officer and has been a member of the Board of Directors since its inception in August 1987. He also served as Shaw's President from its inception until August 2003. Bernard has been the Chairman of the Board of Directors since August 1990. Bernard, as a director, owed a duty to Shaw and its shareholders to be reasonably informed about the business and operations of the Company. As CEO, President and Chairman of the Board, Bernard also assumed important managerial responsibilities which required him

to be well informed about the day-to-day operations of the Company. However, Bernard breached these duties by actively participating in, encouraging, sponsoring, and/or approving many of the wrongful acts or omissions complained of herein and/or purposefully or recklessly disregarding these wrongful acts or omissions. During the Relevant Period, Bernhard engaged in insider trading, disposing of 1,480,000 shares of Shaw stock for proceeds of approximately $58,851,392.20.

103. Barfield has been a member of Shaw's Board of Directors since September 2003. He has served as Shaw's President and Chief Operating Officer since September 2003. He has been employed with Shaw since 1994 in a variety of capacities, including General Counsel and secretary. Barfield, as a director, owed a duty to Shaw and its shareholders to be reasonably informed about the business and operations of the Company. As COO and President, Barfield also assumed important managerial responsibilities which required him to be well informed about the day-to-day operations of the Company. However, Barfield breached these duties by actively participating in, encouraging, sponsoring, and/or approving many of the wrongful acts or omissions complained of herein and/or purposefully or recklessly disregarding these wrongful acts or omissions.

104. Grigsby has served on Shaw's Board of Directors since January 1995. Grigsby, as a director, owed a duty to Shaw and its shareholders to be reasonably informed about the business and operations of the Company. Instead, Grigsby breached these duties by actively participating in, encouraging, sponsoring, and/or approving many of the wrongful acts or omissions complained of herein and/or purposefully or recklessly disregarding these wrongful acts or omissions. Grigsby is the Chairman of the Board of

Directors and the majority owner of Cajun Constructors, Inc. According to Shaw's Definitive Proxy Statement filed on December 24, 2003, Cajun Contractors "has in the past done, and may in the future do, business with [Shaw]." Because of this, the Company noted that Grigsby may "no longer be deemed independent." During the 2002 fiscal year, the Company paid approximately $20,825,000 to the two companies in which Defendant Grigsby held an interest. The Company further owed one of these companies $7,750,000 as of August 31, 2002 (however, the contract with this company was terminated and no additional payments were made to it during fiscal year 2003). During the Relevant Period, Grigsby engaged in insider trading, disposing of 16,000 shares of Shaw stock for proceeds of approximately $666,331.20.

105. Hoyle has served on Shaw's Board of Directors since January 1995. He served on the Board's Audit Committee during the Relevant Period. Hoyle, as a director, owed a duty to Shaw and its shareholders to be reasonably informed about the business and operations of the Company and implement financial and accounting controls necessary to insure that the Company's financial statements complied with GAAP. As a member of the Audit Committee, Hoyle also assumed important managerial responsibilities which required him to be well informed about the day-to-day operations of the Company. Instead, Hoyle breached these duties by actively participating in, encouraging, sponsoring, approving and or failing to implement controls necessary to prevent many of the wrongful acts or omissions complained of herein and/or purposefully or recklessly disregarding these wrongful acts or omissions. During the Relevant Period, Hoyle engaged in insider trading, disposing of 10,000 shares of Shaw stock for proceeds of approximately $451,915.00.

106. McAlister has been a member of Shaw's Board of Directors since April 1990. McAlister, as a director, owed a duty to Shaw and its shareholders to be reasonably informed about the business and operations of the Company. Instead, McAlister breached these duties by actively participating in, encouraging, sponsoring, and/or approving many of the wrongful acts or omissions complained of herein and/or purposefully or recklessly disregarding these wrongful acts or omissions. During the Relevant Period, McAlister engaged in insider trading, disposing of 7,000 shares of Shaw stock for proceeds of approximately $480,762.00.

107. Sinders has been a member of Shaw's Board of Directors since March 1995 and served on the Board's Audit Committee during the Relevant Period. Sinders, as a director, owed a duty to Shaw and its shareholders to be reasonably informed about the business and operations of the Company and implement financial and accounting controls necessary to insure that the Company's financial statements complied with GAAP. As a member of the Audit Committee, Sinders also assumed important managerial responsibilities which required him to be well informed about the day-to-day operations of the Company. Instead, Sinders breached these duties by actively participating in, encouraging, sponsoring, approving, and/or failing to implement the controls necessary to prevent many of the wrongful acts or omissions complained of herein and/or purposefully or recklessly disregarding these wrongful acts or omissions.

108. Barker has served on Shaw's Board of Directors since January, 2004.

109. Roemer has been a member of Shaw's Board of Directors since January 2003.

110. In addition, demand on the Shaw Board of Directors to institute this action is not necessary because such a demand would be a futile and useless act, particularly for the additional following reasons:

a. A majority of the directors of Shaw, as detailed herein, participated in, approved and/or recklessly permitted the wrongs alleged herein to have occurred and participated in efforts to conceal or disguise those wrongs from Shaw's stockholders and are, therefore, not disinterested parties and many are the principal beneficiaries of the wrongdoing alleged herein, and thus could not fairly and fully prosecute such a suit even if such suit was instituted by them;

b. A majority of the directors had a responsibility and obligation to assure that all press releases and filings of SEC reports and registration statements were accurate and that all financial controls and other oversight procedures were in place that would have detected and prevented the false and misleading statements put out by the Company to the public that are further described in this Complaint, however, the Defendant Directors failed to do so, completely abdicating their oversight responsibility to the Company;

c. In order to bring this suit, a majority of the directors of Shaw would be forced to sue themselves and/or persons with whom they have extensive business and/or personal entanglements, which they will not do, thereby excusing demand;

d. The acts complained of constitute violations of state law and the fiduciary duties owed by Shaw's officers and directors and are incapable of ratification;

e. The actions of the directors has impaired the Board's ability to validly exercise its business judgment and rendered it incapable of reaching an independent decision as to whether to accept Plaintiff's demands;

f. Any suit by the directors of Shaw to remedy these wrongs would likely expose the Director Defendants and Shaw to further violations of securities laws which would result in additional civil actions being filed against one or more of the Director Defendants (Bernhard and Barfield are presently Defendants in the related securities class action lawsuits); thus they are hopelessly conflicted in making any supposedly independent determination as to whether to sue themselves;

g. Shaw has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein; yet, the Director Defendants have not filed any lawsuits against themselves or others who were responsible for the wrongful conduct which caused the filing of securities class actions against Shaw, nor have they attempted to recover any part of the damages Shaw suffered and will suffer thereby;

h. If the Defendant Directors were to bring this derivative action against themselves, they would thereby expose their own negligence and misconduct which underlies allegations against the Company contained in the class action complaints for violations of federal securities law. Such

admissions would impair the Company's and their defense of the Class Actions and greatly increase the probability of their personal liability in the Class Actions, in an amount likely to be in excess of any insurance coverage available to the Director Defendants;

i. The Director Defendants are believed to be covered by an insurance policy which covers the type of misconduct alleged herein, which policy would likely preclude coverage, if any, if the Director Defendants initiated action against any of the other Director Defendants named herein. Therefore, Shaw's Board, or any committee thereof, is effectively disabled from complying with any demand that would cause the Company to bring suit against the Defendants because to do so would result in the loss of their insurance coverage.

111. Plaintiff has not made any demand on the shareholders of Shaw to institute this action since such demand would be a futile and useless act for the following reasons:

a. Shaw is a publicly traded company with thousands of shareholders;

b. Making demand on such a number of shareholders would be impossible for Plaintiff, who has no way of finding out the names, addresses or telephone numbers of shareholders; and

c. Making demand on all shareholders would force Plaintiff to incur huge expenses, assuming all shareholders could even be individually identified.

d. Plaintiff will adequately and fairly represent the interests of Shaw in enforcing and prosecuting its rights.

## CAUSES OF ACTION

### Count I
### Against all Defendants for Breach of Fiduciary Duty

112. Plaintiff incorporates by reference and realleges each and every allegation contained above, as though fully set forth herein.

113. The Defendants owed and owe Shaw fiduciary obligations. By reason of their fiduciary relationships, the Defendants owed and owe Shaw the highest obligation of good faith, fair dealing, loyalty and due care.

114. The Defendants breached their fiduciary duties of care, loyalty, reasonable inquiry, oversight, good faith and supervision.

115. Each of the Defendants had actual or constructive knowledge that they had caused Shaw to improperly misrepresent material facts in its public filings and press releases that they had failed to conduct proper due diligence, and the other acts complained of herein. These actions could not have been a good faith exercise of prudent business judgment.

116. As a direct and proximate result of the Defendants' misconduct, Shaw has suffered and will continue to suffer significant damages. As a result of the misconduct alleged herein, the Defendants are liable to the Company.

### Count II
### Against All Defendants for Abuse of Control

117. Plaintiff incorporates by reference and realleges each and every allegation contained above, as if though fully set forth herein.

118. The Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence Shaw, for which they are legally responsible.

119. As a direct and proximate result of the Defendants' abuse of control, Shaw has sustained significant damages, and Defendants are liable to the Company.

**Count III**
**Against Defendants Belk, Bernhard, Gill, Grigsby, Hoyle and McAlister for Breach of Fiduciary Duties for Insider Selling and Misappropriation of Information**

120. Plaintiff incorporates by reference and realleges each and every allegation contained above, as if though fully set forth herein.

121. At the time of the stock sales set forth herein, Defendants Belk, Bernhard, Gill, Grigsby, Hoyle and McAlister knew the information described above, and sold Shaw common stock on the basis of such information. The information described above was proprietary, non-public information concerning the Company.

122. The Company is entitled to the imposition of a constructive trust on any profits Defendants Belk, Bernhard, Gill, Grigsby, Hoyle and McAlister obtained thereby.

**Count IV**
**Against All Defendants for Contribution And Indemnification**

123. Plaintiff repeats and realleges each and every allegation set forth above.

124. Shaw is alleged to be liable to various persons, entities and/or classes by virtue of the same facts or circumstances as are alleged herein to give rise to Defendants' liability to Shaw.

125. Shaw's alleged liability on account of the wrongful acts and practices and related misconduct described above arises, in whole or in part, from the knowing, reckless, disloyal and/or bad faith acts or omissions of the Defendants as alleged above, and Shaw is entitled to contribution and indemnification from each of the Defendants in connection with all such claims that have been, are or may in the future be asserted against Shaw by virtue of the Defendants' misconduct.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment as follows:

A. Against all of the Defendants for the damages sustained by Shaw as a result of the breaches of fiduciary duty and abuse of control;

B. Equitable and/or injunctive relief as permitted by law;

C. Restitution and disgorgement of profits;

D. Attorneys fees and Costs

E. Any such other and further relief as may be just and proper under the circumstances.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.

Dated: August 6, 2004.

Respectfully submitted,

**LEONARD A. DAVIS**, Bar No. 4430
***Herman, Herman, Katz & Cotlar, LLP***
820 O'Keefe Avenue
New Orleans, LA 70113
Telephone: (504) 581-4892
Fax No.: (504) 561-6024
ldavis@hhkc.com

-and-

William B. Federman, OBA #2853
FEDERMAN & SHERWOOD
120 Robinson Avenue, Suite 2720
Oklahoma City, OK 73102
(405) 235-1560/Fax (405) 239-2112
wfederman@aol.com

-and-

Brian M. Felgoise
LAW OFFICES OF BRIAN M. FELGOISE
261 Old York Road, Ste. 423
Jenkintown, PA 19046
Tel: (215) 886-1900
Fax: (215) 886-1909

-and-

Marc S. Henzel
LAW OFFICES OF MARC S. HENZEL
273 Montgomery Avenue, Suite 202
Bala Cynwyd, PA 19004
Tel: (610) 660-8000
Fax: (610) 660-8080

I:\ShawGroup\ComplaintFederman.doc

VERIFICATION

I, Larry F. Reusche, hereby declare as follows:

1. I am the named Plaintiff in the referenced Derivative action against the Director-Defendants and The Shaw Group, Inc. as the Nominal Defendant.

2. I am currently a shareholder in The Shaw Group, Inc. common stock.

Executed this 19 day of July, 2004.

Larry Reusche

Larry F. Reusche